ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Alloy Surfaces Company, Inc. | )   ASBCA No. 59625 |
| | ) |
| Under Contract No. W15QKN-04-D-1002-0014 | ) |

APPEARANCES FOR THE APPELLANT:    David Z. Bodenheimer, Esq.
Jason M. Crawford, Esq.
Jason C. Lynch, Esq.
  Crowell & Moring LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Scott N. Flesch, Esq.
  Army Chief Trial Attorney
Harry M. Parent III, Esq.
Robert B. Neill, Esq.
  Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal involves a dispute as to the pricing of a delivery order (DO) for the manufacture of M211 infrared countermeasure decoy flares. Appellant Alloy Surfaces Company, Inc. (Alloy or appellant) held an Indefinite Quantity/Indefinite Delivery (IDIQ) contract with the United States Army (Army or government) for the procurement of M211 Infrared Countermeasure Decoys, which are fired from helicopters to avoid heat-seeking rounds. The Army awarded the contract in January 2004. In April 2006, the government requested a proposal for a substantial quantity of additional M211s to be procured under DO 0014 (DO 14).

During 2006, appellant was in the process of automating certain manufacturing processes and bringing two additional plants on-line. By early September 2006, Alloy completed DO 13, utilizing its automated manufacturing processes at its original plant.

Appellant submitted its proposal for DO 14 in April 2006. Its proposal did not contain any material and labor usage data related to DO 13; rather, it contained similar data from earlier jobs which were produced without the automated processes utilized in DO 13. In August 2006, the government and appellant began negotiations on the proposal which ultimately led to Modification No. P00025 and DO 14.

The government contends that it relied on defective material and usage rates when it negotiated the price for DO 14 and that it agreed to a higher price than it would have if it had access to the DO 13 data. On July 24, 2014, the contracting officer (CO) issued a Contracting Officer's Final Decision (COFD) asserting that

appellant provided defective cost or pricing data to the Army during the negotiation leading to the award of DO 14. The Army seeks $15,920,212 plus interest. This appeal followed. Both entitlement and quantum are before us.

We hold that job cost sheets prepared by Alloy during the production of DO 13 were management tools that contained both factual and judgmental information, but did not possess the requisite degree of certainty necessary for providing certified cost data to the government. In particular, at the time of price agreement on September 25, 2006, the reports were not sufficiently certain to be certified as "cost and pricing data" pursuant to the Truth in Negotiations Act, 10 U.S.C. § 2306a.

Finally, we hold that the Army fully was aware of the effect of automation on the pricing for the flares, but chose instead to rely on manufacturing data from earlier, non-automated jobs. As the Army acknowledged during its negotiations, the pricing of the non-automated jobs best reflected a compromise between the increased efficiency of automation and the inefficiency of increasing production. We conclude that having the data from DO 13 would not have shed light on the anticipated inefficiencies of qualifying new plants, installing new equipment, and hiring new workers, and, ultimately, would not have changed the price the government negotiated with Alloy. We sustain the appeal.

## FINDINGS OF FACT

I. Prior Contract History

1. On July 7, 1999, the Army awarded Contract No. DAAE30-99-C-1084 (the 1999 contract) to Alloy for the production of a quantity of 6,800 M211 decoy flares (R4, tab 60 at 3; answer at 38).

2. The Army issued Modification No. P00041 under the 1999 contract with an effective date of March 28, 2003 (answer at 3). Modification No. P00041 is also known as Job No. 1516 (R4, tab 80 at 8; tr. 1/84-85).

3. In August 2005, Alloy completed delivery of 120,553 M211 decoy flares under Modification No. P00041 (Job 1516) (R4, tab 80 at 8).

II. The Base Contract

4. On January 23, 2004, the Army awarded Indefinite Quantity/Indefinite Delivery (IDIQ) Contract No. W15QKN-04-D-1002 (the 2004 contract) to Alloy for the procurement of 700,000 M211 Infrared Countermeasure Decoys (decoys, flares,

M211s, or M211 decoys), with a maximum value of $25,914,000 (R4, tab 1 at 3, 10, tab 74 at 5-6). Subsequent contract modifications progressively increased the maximum ceiling price to $200,548,507.00 (R4, tab 74 at 3).

5. Infrared countermeasure flares, or decoys, are devices used to protect helicopters from heat-seeking missiles. The M211 decoy consists of a metal case that's nominally an inch square and eight inches long, filled with between 2,500 and 3,000 thin metal foils that have a special coating on them that reacts in the air to perform their countermeasure work to decoy heat-seeking missiles. (Tr. 1/179).

6. The 2004 contract incorporated Federal Acquisition Regulation (FAR) clauses 52.215-10, PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (OCT 1997), and 52.215-11, PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA – MODIFICATIONS (OCT 1997) (R4, tab 1 at 35). According to FAR § 15.407-l(b)(l), "[t]he clauses give the Government the right to a price adjustment for defects in certified cost or pricing data submitted by the contractor, a prospective subcontractor, or an actual subcontractor." FAR § 15.407-1(b)(1).

A. Previous Delivery Orders for M211 Decoy Flares

7. Prior to the award of DO 14 at issue in this appeal, the Army issued other delivery orders to Alloy for M211 decoy flares under the 2004 contract (answer ¶ 8). These delivery orders included:

- Delivery Order 1 on February 5, 2004 (R4, tab 2).
- Delivery Order 6 on June 17, 2005 (R4, tab 25).
- Delivery Order 7 on October 10, 2005 (R4, tab 30).
- Delivery Order 8 on November 23, 2005 (R4, tab 34).
- Delivery Order 11 on January 26, 2006 (R4, tab 44).
- Delivery Order 13 on May 16, 2006 (R4, tab 52).

8. Alloy assigned job numbers relating to the work under both Modification No. P00041 (1999 contract) and the above delivery orders (2004 contract at issue):

| Army Contract Reference | Alloy Job No. |
|---|---|
| Modification No. P00041 | Job No. 1516 |
| Delivery Order 1 | Job No. 1528 |

3

| | |
|---|---|
| Delivery Order 6 | Job No. 1573-1 |
| | Job No. 1573-2 |
| Delivery Order 7 | Job No. 1596 |
| Delivery Order 8 | Job No. 1601 |
| Delivery Order 11 | Job No. 1611 |
| Delivery Order 13 | Job No. 1626 |

(Compl. ¶ 8)

9. Army CO Sandra LaBell signed and awarded DO Nos. 6, 7, 8, 11, and 13 (R4, tabs 25, 30, 34, 44, and 52).

10. The Army knew that DO Nos. 6, 7, 8, 11, and 13 had been produced in Plant 1. In its cost proposal for DO 14, Alloy stated that it would add substantial amounts of equipment, including expanding Plant 2, starting production at Plant 3, and hiring 234 new employees. (Tr. 1/178; R4, tab 50 at 3; app. supp. R4, tab 2; tr. 1/61-62)

1. Delivery Order 13 Introduces More Efficient Manufacturing Processes

11. On May 16, 2006, the government placed DO 13 against the contract (R4, tab 52).

12. DO 13 called for the fabrication, test, and delivery of 33,379 M211 decoys in two lots, with a portion to be used for lot testing (R4, tab 52 at 5, tab 96 at 7).

13. DO 13 was produced in Plant 1, but, unlike previous delivery orders, Alloy manufactured DO 13 using all-new automated processes (tr. 2/180; R4, tab 96 at 8-9). The Army was aware that DO 13 was produced in Plant 1 (tr. 3/45-46).

14. In particular, the manufacturing process for DO 13 included the use of auto-loaders, the one-step bake, and the auto epoxy processes. When combined, these processes produce efficiencies in labor usage and material usage. (R4, tab 96 at 8-9)

15. Pursuant to the Production Prove-Out Contract No. W15QKN-04-1002, the Army reviewed and approved each step of the automated production process used

to manufacture M211 decoys in Plant 1. (R4, tab 60 at 3; tr. 1/136; app. supp. R4, tabs 13-24).

### 2. Delivery Order 14 Required Substantial Production Ramp-Up

16. To increase the volume and rate of M211 production, the Army initiated two interrelated procurement actions. First, it negotiated Modification No. P00025 to raise the quantity ceiling and establish prices for issuing DO 14. Second, it supported a Production Prove-Out effort to increase Alloy's M211 production capacity and rate (R4, tab 60 at 3).

17. As explained in the Army's August 9, 2006 Business Clearance Memorandum, these procurement actions were necessary to support the increase in production quantity to support Operation Iraqi Freedom, and Operation Enduring Freedom, and the Global War on Terrorism (R4, tab 60 at 3).

18. DO 14 required the largest production ramp-up for delivering M211 decoy flares under either the 1999 contract or the 2004 Contract (answer at 43; tr. 1/63, 2/202-03).

19. At the time of the Army's request for a price proposal for DO 14, in April 2006, Alloy was producing M211 units against the IDIQ contract at a rate of 25,000 – 35,000 units per month, of which the referenced DO Nos. 6, 7, 8, 11, and 13 were included. The Army's request in April 2006 required Alloy to dramatically increase output, tripling Alloy's output to 80,000 units per month. (R4, tab 78 at 1; tr. 2/210-11)

20. Alloy explained, in its April 18, 2006 proposal, that "2006 is a major ramp-up year for ASC" and it was "ramping-up from 37,000 units/month to 80,000 units/month" (R4, tab 50 at 3). The Army's witnesses did not challenge this assertion (tr. 1/58, 2/70).

21. In order to meet the Army's increased demand for decoy flares, Alloy opened two additional plants for the manufacture of decoy flares, known as Plants 2 and 3 (tr. 4/10-11, 37). In total, Alloy would have three plants and approximately 240-250 employees involved in decoy flare production (tr. 4/37).

22. For the ramp-up for DO 14, Alloy advised the Army that it would need to "add substantial amounts of equipment and will be hiring 234 new employees, most of who will be working on this effort" (R4, tab 50 at 3).

23. The ramp-up effort was necessary in order to be able to produce at the levels needed for DO 14 within the time frames required by the Army (tr. 2/67, 103).

24. DO 14, when awarded, would use the same type of automated equipment used on DO 13 (R4, tab 96 at 2).

25. On March 30, 2006, Alloy's Chief Financial Officer (CFO), Larry D'Andrea, sent an email to the CO stating that: "the pricing for the M211s are extremely complex due to the manufacturing from 3 plants (two of which are new for M211s production) and due to incorporation of ramp-up assumptions" (app. supp. R4, tab 2).

26. According to Mike Mignogna, Alloy's Vice President of Operations, the ramp-up associated with DO 14 would require Alloy to obtain permitting and expand M211 operations to two new plants; pass first article testing; qualify and install new equipment; and hire and train new employees (tr. 4/64-66).

27. Before Alloy could use a new piece of equipment it had to be qualified: "[t]he Army required qualifications, which – on every piece of equipment, so we had to actually qualify, write a report, get the approval and, you know, it was a big process." (Tr. 4/66)

28. The Army knew that DO 14 would require new employees (R4, tab 50 at 3).

3. The Army Required Prior Notice and Approval before Adding New Equipment or Processes for M211 Production

29. Pursuant to the First Article Clause, Alloy was required to give prior notice and obtain Army approval before adding new equipment or processes for M211 production (app. supp. R4, tab 16 at 1; tr. 4/66).

30. During the DO 14 negotiations, the Army, including the CO, knew which automation equipment had been qualified and approved for M211 production (tr. 1/136; 2/102).

31. The Army understood that Alloy would be ramping-up from 37,000 units a month to 80,000 units a month, based upon their involvement in the Production Prove - Out Proposal and contract (tr. 1/58-59, 2/69-70).

32. As the person who signed off on the qualification reports for the M211 production equipment, CO LaBell was aware that Alloy would be adding substantial amounts of new equipment to Plant 2 and Plant 3 for this production proposal (tr. 1/59-60).

B. Negotiations for Delivery Order 14

1. Key Government Personnel and Technical Team's Role

33. Key individuals involved in the government's negotiation of DO 14 (R4, tabs 73-74), included Ms. LaBell, the procuring CO, and Mr. David M. Dreifus, engineer.

34. Ms. LaBell is an Associate Director at Army Contracting Command – Picatinny Arsenal, New Jersey. Ms. LaBell's 37-year career in acquisition at Picatinny includes approximately eight years as a CO; she was the CO at the time of the negotiation at issue in this appeal. (Tr. 1/21-23)

35. Ms. LaBell first became involved with appellant's contract in 2004, when she became a contracting officer and issued delivery orders against the original contract (tr. 1/25). She communicated with appellant's employees Larry D'Andrea and Karen Justman regarding those delivery orders (tr. 1/25).

36. Mr. Dreifus is an engineer currently employed by the Army's Armaments Research, Development and Engineering Center at Picatinny Arsenal in New Jersey (tr. 1/166-67).

37. Mr. Dreifus was involved in a number of roles on appellant's M211 infrared countermeasure decoy contract (tr. 1/171-72). Mr. Dreifus was involved in first article testing, lot acceptance testing, and qualification testing of appellant's production equipment as appellant did production ramp-up and production capability ramp-up (tr. 1/172).

38. Mr. Dreifus also was involved in supporting the contract negotiations resulting in Modification No. P00025 and DO 14 (tr. 2/20-21).

2. Alloy's April 2006 Price Proposal

39. On April 18, 2006, Alloy submitted its cost proposal, which identified the different materials needed for each unit of M211 production. Similarly, the proposal identified what types of labor operations would be required and how many hours (or fractions of an hour) would be needed for each M211 labor operation. (R4, tab 50 at 8-15; tr. 1/199)

40. In its April 18, 2006 proposal, Alloy explained that "2006 is a major ramp-up year for ASC" and it was "ramping-up from 37,000 units/month to 80,000

units/month[.]" Alloy further explained that it "will add substantial amounts of equipment and will be hiring 234 new employees, most of who will be working on this effort." (R4, tab 50 at 3)

41. The CO understood that Alloy would be ramping-up from 37,000 units a month to 80,000 units a month (tr. 1/58). She had this understanding based upon her oversight of the Production Prove-Out proposal and contract and her awareness of the status of the ramp-up operation (tr. 1/58, 2/70).

42. Alloy produced decoy flares for DO Nos. 6, 7, 8, 11, and 13 in Plant No. 1 (tr. 2/178, 3/52).

43. Alloy produced decoy flares for DO 14 in Plant Nos. 2 and 3, rather than Plant No. 1 (R4, tab 78 at 2; tr. 1/122).

44. Appellant's April 18, 2006 proposal incorporated a 10 percent factor for a negative learning curve, essentially asserting appellant's increased automation would, at least initially, yield diminished returns due to a need to hire and train personnel. That 10 percent negative learning curve factor came from appellant's Vice President of Operations, Mike Mignogna, working with his team. (Tr. 4/38, 90) The 10 percent learning curve factor took into consideration all the inefficiencies with new employees, new equipment, and new plants that would be needed for the contract (tr. 4/38).

45. CO LaBell "agreed that they [Alloy] would be hiring new employees to ramp-up." (Tr. 1/61-62) Mr. Dreifus understood that it was going to take a lot of new employees working on the M211 production to handle the ramp-up associated with DO 14 (tr. 2/72).

46. Both CO LaBell and Mr. Dreifus agreed that, in their experience, new employees are generally less efficient than existing employees (tr. 1/62, 2/73).

### 3. Army's Initial Technical Evaluation

47. Prior to negotiations, the Army contracting office asked Army engineers David Dreifus, Franki Fong, and Adrian Nitu-Solomon (the "technical team") to perform a technical evaluation of Alloy's April 18, 2006 cost proposal including the quantities of material, types of material, quantities of labor, and types of labor that Alloy had proposed (R4, tab 60; tr. 1/185-86, 193-94).

8

48. On May 17, 2006, the Army technical team submitted to CO LaBell its "Technical Evaluation to Cost Proposal Regarding Contract W15QKN-04-D-1002 for delivery quantities of 450k to 950k, Revision 1-2" (R4, tab 60 at 39; answer at 6).

49. Mr. Dreifus did much of the drafting of the technical evaluation memorandum, and agreed with technical evaluation findings set forth in the report (tr. 2/75).

50. Mr. Dreifus understood that CO LaBell and contract specialist, Ms. Robertson would be relying upon the Army's technical evaluation and he tried to make sure that the evaluation was done as well as he could (tr. 2/75-76).

51. In developing the technical evaluation, the Army technical team relied upon the following sources of information: (i) technical requirements; (ii) testing and inspection requirements; (iii) direct observation; (iv) production and delivery rates and schedules; (v) historical information about previously submitted proposals for M211 production; and (vi) engineering estimates (R4, tab 60 at 39; tr. 1/197-98, 2/76-77).

52. Within the initial technical evaluation, the Army technical team addressed all of the direct labor and direct material usage rates proposed by Alloy and evaluated whether the proposed rates were reasonable or unreasonable (R4, tab 60 at 41-49; tr. 1/199).

53. Where the technical team found a proposed rate unreasonable, the technical team took technical exception to the proposed rate, meaning that they disagreed with the rate Alloy had proposed (tr. 1/30-31; 1/199).

54. For labor usage, the Army developed its independent technical labor usage factor of 0.8062 hours per unit for a quantity range of 700,000-749,999 units (answer at 11; R4, tab 60 at 28; tr. 3/22-23). For a quantity of 750,000 flares, the Army developed an independent labor usage factor of 0.8064 hours/unit (R4, tab 60 at 28; tr. 3/23; app. supp. R4, tab 35). These estimates were based on the Army's own independent evaluation and judgment for producing M211 flares (answer at 11).

55. In its Initial Technical Evaluation, the Army prepared independent labor usage factors for all labor operations, including for the recoil, dry/bake, and slit/chop/load automated operations (R4, tab 60 at 30-31, 47-48).

4. Business Clearance Memorandum

56. On August 10, 2006, CO LaBell and Ms. Robertson, signed the Business Clearance Memorandum (BCM) for negotiating increased quantities of M211 decoy flares under the 2004 contract (R4, tab 60 at 2).

57. CO LaBell confirmed that the BCM used the same material and labor usage factors as those found in the Army's initial technical evaluation (R4, tab 60 at 6-9, 29-32, 41-42, 47-48;tr. 1/29-30).

58. The Army based its pre-negotiation positions upon labor and material usage factors reflected in the BCM and supported by the Army technical evaluation (R4, tab 60 at 6-9, 29-32, 41-42, 47-48; tr. 1/26-27).

59. For its pre-negotiation positions, the Army developed overall labor usage values based upon specific quantity ranges:

- 0.8062 labor hours for quantity range of 700,000 – 749,999 units.
- 0.8064 labor hours for quantity range of 750,000 – 799,999 units

(Answer at 11; tr. 1/153, 155; R4, tab 60 at 28)

60. For its pre-negotiation position, the Army prepared its labor usage estimate based upon its own independent evaluation and judgment (answer at 11).

5. Price Negotiations

61. Negotiations for Modification P00025 and DO 14 spanned the period of August 16 through September 25, 2006 (app. supp. R4, tab 6; answer at 7; R4, tab 71 at 3).

62. According to CO LaBell, everything discussed within the negotiation is captured in the Price Negotiation Memorandum (PNM) (R4, tab 71), which she drafted along with Ms. Robertson (tr. 1/32-33).

63. Additionally, the BCM, dated August 9, 2006, contains the government's pre-negotiation strategy and its initial technical evaluation (R4, tab 60).

64. On August 16, 2006, Ms. Robertson initiated negotiations by sending a letter to appellant and taking exception to appellant's proposed labor usage rates (app. supp. R4, tab 6; answer at 7).

10

65. That same day, Alloy responded by faxing a two-page breakdown of actual material and labor usage rates from two completed delivery orders, Alloy Job #1516 under the 1999 contract, which was completed in August 2005, and Alloy Job #1528 under the 2004 contract, which was completed in February 2006 (hereinafter referred to as Jobs 1516 and 1528) (app. supp. R4, tab 4). The August 16, 2006 fax set forth material usage data and labor usage data for Jobs 1516 and 1528, and included a weighted average of Jobs 1516 and 1528 for labor usage of 0.96444 hours/unit (app. supp. R4, tab 4).

66. Knowing that the learning curve involved some risk for appellant, Alloy built inefficiencies into its direct costs for its proposal (tr. 4/40).

67. On August 18, 2006, the Army took exception to Alloy's use of Jobs 1516 and 1528 as bases for proposed costs and identified specific labor operations where Alloy had gained greater efficiencies (app. supp. R4, tab 7; R4, tab 104). Specifically, the government argued that the labor usage rates should be lower due to increased process efficiency and improvements which had been introduced into the manufacturing process after the completion of DO 0001 (R4, tab 71 at 13).

68. The 10 percent negative learning curve became a point of discussion during negotiations. CO LaBell testified that Alloy's proposal originally contained a 10 percent risk factor, in addition to a higher proposed usage rate, and that during negotiations the parties agreed to remove the 10 percent risk factor in exchange for utilizing a weighted average of the job cost and data for Jobs 1516 and 1528 (tr. 1/159-160).

69. Mr. Dreifus participated in telephonic discussions with Alloy personnel during the negotiations. Mr. Dreifus testified that the parties discussed actual direct materials and labor usage rates for Alloy's M211 production in negotiations. (Tr. 2/25-26)

70. Mr. Dreifus testified that the government technical evaluators had concerns about the suitability of the actual usage rates that Alloy provided in negotiations because the government evaluators believed that the actuals for jobs 1516 and 1528 were not representative of the more automated state of Alloy's current production process (tr. 2/27-28).

71. On September 22, 2006, the Army technical team issued its final technical evaluation (R4, tab 69).

11

72. The PNM incorporated the Final Technical Evaluation's finding that "Some inefficiency may occur due to additional production rate ramp-up" (R4, tab 71 at 6-7, 13-17, tab 69 at 5-7, 14-19).

73. Regarding ramp-up inefficiency, the PNM stated: "The Government acknowledged that some inefficiency could occur due to additional production rate ramp-up" (R4, tab 71 at 13-16).

74. CO LaBell, who signed off on the PNM, testified:

Q. When you signed off on the price negotiation memorandum, is it correct that you were signing off as the contracting officer representing the Government?

A. Yes, I was. Yes.

Q. When you signed off on the statement, the Government acknowledges that some inefficiency could occur due to additional production rate ramp-up, you were signing in your capacity as the contracting officer, correct?

A. Yes.

Q. You made this acknowledgement for at least four categories or material usage factors, steel, tantalum, liquid caustic, and aluminum, correct?

A. Correct.

Q. You also made this acknowledgement for every category of labor usage, except for test support, correct?

A. Correct.

(Tr. 1/105-06; 1/116-17)

75. On September 25, 2006, the parties finalized their price negotiations for additional M211 flares (answer at 12).

76. The Army knew that its independent labor usage factors in its Initial Technical Evaluation were lower than what the Army negotiated for these factors.

12

| M211 Labor Operations | Negotiated Labor Usage | Technical Evaluation Labor Usage |
|---|---|---|
| Recoil | 0.04773 | 0.04314 |
| Dry/Bake | 0.14705 | 0.07874 |
| Slit/Chop/Load | 0.35000 | 0.22232 |

(R4, tab 71 at 14-15, tab 60 at 30-31; tr. 2/155-157)

77. Compared with the negotiated labor usage value (0.9704), the Army's known and disclosed labor usage value (0.73008) was about 24 percent lower than the negotiated value (tr. 3/66-69; app. supp. R4, tab 35).

### 6. The DO 13 Job Cost Report

78. In its COFD, the Army contended that Alloy had a duty to submit Work-in-Process (WIP) sheets during negotiations. Specifically, the Army contended that Alloy had a duty to provide the September 2006 job cost report for DO 13 to the Army during the price negotiations. (R4, tab 96 at 3-4, 9)

79. In the top left corner, the September 2006 job cost report for DO 13 (DO 13 WIP sheet) bore a date of September 24, 2006, which was a Sunday. This date identified the "month-end close date" or "cutoff period." (Tr. 4/22; app. supp. R4, tab 30) The Army does not contest that September 24, 2006 represented the cutoff date after which Alloy conducted a physical inventory count and reconciliation (tr. 3/60, 4/27-28; gov't br. at 29-30).

80. In the bottom right corner of the DO 13 WIP sheet, the date of Friday, September 29, 2006, appears (app. supp. R4, tab 30). This date is when the DO 13 WIP sheet became available to Alloy's management (tr. 4/22-23). Once the WIP sheet became available to Alloy's management, it was then verified through the reconciliation process (tr. 4/23). Appellant, typically closed its books on the last Sunday of the month (tr. 4/26; app. supp. R4, tab 30). Each month, appellant conducted a full reconciliation of its reports (tr. 4/26), to include a review of labor timesheets (tr. 4/27-28).

81. Mr. D'Andrea testified that the job cost reports show "standards as well as our actuals that are captured for the month and contract to date. It also gives an estimate to complete." (Tr. 4/21) He further explained that Alloy took significant steps to verify the data to the extent possible:

13

> Before we even close the books, we do an analysis, a
> summary of our results for the month. Then also we do a
> pro forma forecast to the end of the year in which you have
> to look at issues to complete your contracts, backlog, fills,
> forecasts, then what your profits are, and then attach [sic].
> So, yes, we reviewed that."

(Tr. 4/25-26) According to Mr. D'Andrea, the whole purpose of the forecasts was to see if appellant was going to meet its budget, and sometimes to look ahead to the next fiscal year (tr. 4/26).

82. Alloy followed the practice of not furnishing WIP sheets because, prior to job completion and accounting reconciliation, the WIP report included judgmental information (tr. 4/14). At times, Mr. D'Andrea had seen substantial "variations" between the WIP data before doing reconciliation and after issuing the final report:

> I'd like to explain the WIP process and why WIP sheets
> are judgmental and aberrant. And at times, the WIP sheets
> when they're finalized could be very close to actuals. You
> don't have broad variations, but mostly we have seen
> larger variations and we got burnt and [sic] on many
> occasions.

(Tr. 4/15)

83. Mr. D'Andrea further explained why the WIP process involved judgment and variations, including the need to develop estimates for "equivalent units" prior to completing production and conducting the final inventory count (tr. 4/15-19; R4, tab 79 at 2, 11-14).

84. Mr. D'Andrea explained that considerable judgment was involved in allocating both labor and material to particular jobs. For example, several different types of metal are combined into a slurry which is used to manufacture M211 flares for the Air Force, Navy, and Army. The raw metals used in the slurry must be allocated to each job consistently. Similarly, labor hours must be allocated to separate jobs, even though individual workers are not charging their time to each separate job. The allocation is done by someone in the production department. The production department develops a usage rate for both material and labor, on a per unit basis, by dividing the allocated material and labor by the number of units produced. (Tr. 4/16-19)

14

85.  WIP data for labor usage for different jobs exhibited significant volatility, showing variances of between 33 and 500 percent in labor usage for the same month on the same production line (R4, tab 81 at 5).

86.  As the Alloy official responsible for signing the Certificate of Current Cost or Pricing Data, Mr. D'Andrea did not believe the WIP sheets to be sufficiently accurate to certify until after the job had been completed and the accounting data had been reconciled (tr. 4/18-19).

7.  Whether the Army Requested the DO 13 Job Cost Report

87.  CO LaBell testified that Alloy did not provide any material and labor usage rate data for DO 13 during the price negotiations for DO 14 (tr. 1/38-39).  She stated that the government requested this data during negotiations (tr. 1/39), but Alloy stated that it would not disclose the data because it was WIP data, and a DD 250 had not been developed and submitted (tr. 1/40 (LaBell), 4/30 (D'Andrea).

88.  During the course of Modification No. P00025 and DO 14 negotiations, the Army knew that Alloy had an established practice of not providing WIP sheets prior to completion of the job (app. supp. R4, tab 9, tab 12 at 4-5).

89.  On direct examination, CO LaBell initially testified that the Army had requested WIP sheets for Delivery Order 13 during the negotiations for Modification No. P00025 and DO 14 (tr. 1/39).  On cross examination, CO LaBell acknowledged that she never told Alloy that she needed the WIP sheets to award DO 14, nor that lack of WIP sheets would make the delivery order un-awardable (tr. 1/149).  She also admitted that there was no written record for any Army request for WIP sheets (tr. 1/144), and, if a request had been made, it would have been in the contract files and documented in the PNM (tr. 1/144-45).

90.  The PNM does not mention any Army request for data for DO Nos. 6, 7, 8, 11, or 13 (R4, tab 71).

15

C. Decision to Rely on Job 1516 and 1528 Data

91. Regarding the job cost spreadsheets at R4, tab 75 (tr. 1/43-49), CO LaBell testified the government did not have access to that data during negotiations and that "[t]his is the documentation we would have liked to have during negotiations." (Tr. 1/48)

92. CO LaBell acknowledged the government was under a time constraint to procure M211 decoys, explaining that there were two wars ongoing at the time and "time constraints just had to do with trying to get the flares to the soldiers." (Tr. 1/162)

93. When asked whether she had any options other than entering into the contract with the prices included in Mod. P00025, Ms. LaBell testified she could have awarded an undefinitized contract action (UCA), although she did not think that would have gained the government anything (tr. 1/49). She has issued UCAs many times, is familiar with the process, and has in the past obtained approval for such actions (tr. 1/150).

94. When asked about how DO 13 would have been used in negotiations, CO LaBell initially stated:

> It would have been a been a lower price to the Government, based on the information that we received from PO 41 and Delivery Order 1, it would have been a lower unit price.

(Tr. 1/44-45)

95. CO LaBell testified that Army Contracts would have referred the DO 13 data to the Army technical team, but did not say what the Army would have done:

> We would look at this, but we also would refer to technical. With this spreadsheet, it talks about the usage rate for the decoys, and then it talks about the actuals for the month. Then it also talks about the WIP, work in process. We would look at the various columns, and then we would discuss this with technical.

(Tr. 1/48; gov't br. at 32)

16

96. CO LaBell testified she signed Modification P00025 relying upon the certificate of current cost or pricing data, and on the assumption the government would be able to recover any defective pricing costs later:

> Q: You signed the Modification P00025 relying on upon the certificate current costs and pricing data, on the assumption that you would be able to recover any defective pricing cost later, correct?
>
> A: Correct.

(Tr. 1/151-52)

97. CO LaBell testified that the government used a weighted average as opposed to just the lower numbers on Job 1528 because the government "had to look at items and the experience that we experienced. For example, labor, as well as material, it depended on what we were experiencing at that time." (Tr. 1/160-61)

98. In 2006, soon after award of DO 14, CO LaBell was promoted out of her contracting officer position (tr. 1/51), and by 2012, CO LaBell was Associate Director at ACC Picatinny, and Ms. Heather Gandy had assumed the role of contracting officer on appellant's contract (tr. 1/443).

99. Mr. Dreifus testified that, "in the end there was a decision to go and use the actual 1516 and 1528 [data]. Because Alloy was unable or unwilling to provide any more recent and relevant information, despite our requests for it." (Tr. 2/31)

100. Mr. Dreifus testified that the government technical evaluators' concerns with the information that Alloy had provided are recorded in the final technical evaluation report.

101. For example, the government still took exception to the appellant's proposed usage rate for steel and believed that it should be lower and without any additional percentage. Mr. Dreifus stated in his hearing testimony that this was based on the appellant being more effective and efficient with new automated equipment. (Tr. 2/31-32)

102. Mr. Dreifus explained in his testimony that, in the end, the parties agreed not to incorporate appellant's proposed 10 percent negative learning curve. Instead, the parties decided to use the appellant's actuals from jobs 1516 and 1528 as the basis for the negotiated agreement (tr. 2/33-34, 4/38-40).

17

103. Mr. Dreifus explained that comments in the government's final technical evaluation that "some inefficiency may occur due to additional production rate ramp-up" were included in the technical evaluation report to try to capture statements by the appellant that it had concerns about production ramp-up (tr. 2/34-35).

104. Mr. Dreifus testified that the government did not attempt to quantify or to ask the appellant to quantify the inefficiency that may occur due to production rate ramp-up, because the appellant already had included a 10 percent negative learning curve as an attempt to account for the anticipated inefficiency, and because appellant already had a separate contract to compensate for its ramp-up activities (tr. 2/35-36).

105. For individual labor operations for Job 1528, the Army knew during negotiations that automation in Plant 1 had resulted in labor usage factors lower than those for Job 1528 disclosed in the August 16 fax. On August 18, 2006, the Army stated that "efficiencies" had already been gained over the "supplied actuals." (App. supp. R4, tab 7; tr. 1/86-91, 2/116-23)

106. For each labor operation for Job 1528 (except test support), the PNM and Final Technical Evaluation stated that labor usage would be lower than the actual usage hours under Job 1528 (R4, tab 71 at 13-17, tab 69 at 14-19).

107. On August 16, 2006, Alloy disclosed to the Army actual labor and material usage factors for Jobs 1528 and 1516 (app. supp. R4, tab 4). The PNM acknowledged receipt of this data: "Alloy submitted sheets which represented 'actuals'" for Jobs 1516 and 1528" (R4, tab 71 at 6-8, 13-16).

108. For individual labor operations for Job 1528, the Army knew during negotiations that automation in Plant 1 had resulted in labor usage factors lower than those for Job 1528 disclosed in the August 16 fax. On August 18, 2006, the Army stated that "efficiencies" had already been gained over the "supplied actuals." (App. supp. R4, tab 7; tr. 1/86-91, 2/116-23)

109. For each labor operation for Job 1528 (except test support), the PNM and Final Technical Evaluation stated that labor usage would be lower than the actual usage hours under Job 1528 (R4, tab 71 at 13-17 [labor usage "lower than that provided under DO 0001"], tab 69 at 14-19 [same]). The Army acknowledged that this meant that labor usage would be lower than the factors in the August 16, 2006 fax, due to increased process efficiency and improvement (tr. 1/109-111).

18

110. For material usage (steel, tantalum, liquid caustic, and aluminum), the PNM and Final Technical Evaluation stated that material usage would be lower than the actual usage hours under Job 1528 (R4, tab 71 at 6-8, tab 69 at 5-7). Mr. Dreifus stated that this meant that material usage would be lower than the factors in the August 16, 2006 fax (tr. 1/100, 2/126-127).

111. Mr. Dreifus testified that, although he provided a technical recommendation, the CO decided to use a weighted average of actual usage rates per decoy from the appellant's Jobs 1516 and 1528 data (tr. 2/36-37).

112. The Army technical team disagreed with the Army decision "made by someone else" within the Army to use the weighted average of Jobs 1516 and 1528:

> Q. So when you say a decision was made, you're saying that the decision was not made by you, Franki Fong, or Adrian Nitu- Solomon to use the weighted average. That decision was made by someone else, is that right?
>
> A. Yes. We had concerns about using those as predictors for the future.

(Tr. 2/113)

113. However, Mr. Dreifus did not explain how the Army technical team would have used the DO 13 data (tr. 2/121, 127).

    D. Certification of Cost or Pricing Data and Award of DO 14

114. By letter dated September 26, 2006, Mr. D'Andrea, Alloy's CFO, certified that the cost or pricing data submitted for DO 14 was, to the best of his knowledge and belief, "accurate, complete, and current as of Monday September 25, 2006" (R4, tab 72).

115. On September 27, 2006, the Army awarded DO 14 to appellant in the amount of $57,037,602 for the procurement of 700,000 M211 decoys (R4, tab 74).

116. On Friday, September 29, 2006, the September job cost report for DO 13 was available to appellant's management. Mr. D'Andrea, who was responsible for negotiations on appellant's behalf, also was responsible for providing the monthly report to appellant's management. (Tr. 4/25)

19

117. Within the DO 13 labor usage data for August and September 2006, the only change in actual hours per unit across the two months was that "production support" increased from 0.0006 hours per unit in August 2006 to 0.0007 hours per unit in September 2006 (R4, tab 75 at 1-2). This corresponds to the 4.5 actual hours of labor for production support noted on the September 2006 report (R4, tab 75 at 2).

### III. DCAA Audit

118. On June 21, 2011, DCAA initiated fact-finding for a post-award defective pricing audit relating to Modification No. P00025 and DO 14 (answer at 40; R4, tabs 76-77).

119. By letter dated July 1, 2011, Alloy responded to DCAA's inquiry and denied defective pricing (R4, tab 78).

120. In September 2011, DCAA issued a draft post-award audit report asserting defective pricing relating to DO 14 (answer at 14-15).

121. On October 18, 2011, Alloy submitted a written response to the DCAA draft audit and disputed the defective pricing allegations (R4, tab 79).

122. On February 10, 2012, DCAA issued its final audit report alleging defective pricing relating to DO 14 (R4, tab 80).

123. On March 12, 2012, Alloy submitted a supplemental response to DCAA's audit and again denied defective pricing (R4, tab 81).

124. On August 8, 2012, the Army issued its Pre-Negotiation Objective and alleged defective pricing based upon DCAA's audit report issued in February 2012 (R4, tab 82).

125. On November 26, 2012, Alloy first received DCAA's February 2012 audit report (R4, tabs 84-85).

126. On July 22, 2013, the Army revised its defective pricing position, relying solely upon DO 13, rather than the DCAA audit position (that used DO Nos. 6, 7, 8, 11, and 13) (R4, tab 88).

20

IV. CO's Final Decision Asserting Government Defective Pricing Claim

127. On July 24, 2014, after reviewing the DCAA Audit Report, Ms. Gandy issued a COFD asserting defective pricing and demanding a repayment of $15,920,212, plus interest (R4, tab 96).

128. The COFD sought a price adjustment of $15,920,212, more than the $12,572,283 price-adjustment recommended in the DCAA audit. The COFD explained that the Army did not disagree with the DCAA's findings, but calculated its own price adjustment based solely on data from DO 13 (R4, tab 96 at 2). DCAA, in contrast, used a weighted average of five delivery orders to calculate its recommended price adjustment. DCAA subsequently concurred with the Army's approach, reasoning that the Army's approach "incorporates the effect of all efficiencies gained just prior to the award of DO 14." (R4, tab 91 at 1)

129. The COFD asserted that the overstated material cost per decoy was calculated to be $1.16 for materials (steel, tantalum, liquid caustic, and aluminum); and the overstated labor hour usage per decoy was calculated to be .36, which is .97 hours negotiated less .61 post award audit computed, utilizing the DO 13 actual data (R4, tab 96 at 9-10).

<u>DECISION</u>

I. Standard of Review for Defective Pricing Claims

The Truth in Negotiations Act (TINA), 10 U.S.C. § 2306a, requires contractors who must submit cost or pricing data "to certify that, to the best of . . . [their] knowledge and belief, the cost or pricing data submitted was accurate, complete and current." 10 U.S.C. § 2306a(a)(2). In addition, TINA requires that any contractual arrangement under which such certification is required "shall contain a provision that the price of the contract . . . shall be adjusted to exclude any significant amount by which it may be determined . . . that such price was increased because the contractor . . . submitted defective cost or pricing data.... 10 U.S.C. § 2306a(e)(1)(A)-(B). In other words, the government will be awarded a contract price adjustment when the government proves that a contractor furnished defective cost or pricing data and "the [g]overnment relied on the overstated costs to its detriment." *Singer Co., Librascope Div. v. United States*, 576 F.2d 905, 914 (Ct. Cl. 1978).

The government has the burden of proof in a defective pricing claim. As a general matter, this entails proving three elements by a preponderance of the evidence. First, the government must establish that the information at issue is "cost or pricing

21

data" within the meaning of TINA. Second, the government must show that the cost or pricing data was either not disclosed or not meaningfully disclosed to a proper government representative. Third, it must demonstrate detrimental reliance on the defective data. *United States v. United Technologies Corp.*, 51 F. Supp. 167 (1999) (discussing three elements and burden of proof); *also Wynne v. United Technologies Corp.*, 463 F.3d 1261, 1264 (Fed. Cir. 2006) (discussing detrimental reliance). In that regard, it is aided by a presumption that the non-disclosure of data resulted in an overstatement of the price of the contract. *Sylvania Elec. Prods., Inc. v. United States*, 479 F.2d 1342, 1349 (Ct. Cl. 1973). If that presumption of causation is rebutted, however, the government only can prevail "upon proof that it relied upon the defective data to its detriment in agreeing to the contract price." *Wynne*, 463 F.3d at 1263. *See Lockheed Martin Aeronautics Co.*, ASBCA No. 56547, 13 BCA ¶ 35,220 at 172,815 (holding that presumption is rebuttable and not a substitute for specific proof establishing the amount of such damages).

II. The 2006 Job Cost Reports for DO 13 Are Not "Cost or Pricing Data" Pursuant to TINA

Pursuant to TINA, the term "cost or pricing data" means "all facts that, as of the date of agreement on the price of a contract . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly. Such term does not include information that is judgmental, but does include the factual information from which a judgment was derived." 10 U.S.C. § 2306a(h)(1).

The government contends that the June 2006 and August 2006 monthly job cost reports from DO 13 constitute "cost or pricing data" as that term is defined in TINA and its implementing regulations (gov't br. at 45-49). According to the government, Alloy's internal job cost reports contain verifiable factual data related to prior produced lots and some elements of estimation, such as estimated material usage rates which Alloy contends could not be finalized until the end of an entire production run (gov't br. at 45). The government relies on *Texas Instruments, Inc.*, ASBCA No. 23678, 87-3 BCA ¶ 20,195, for the proposition that the job cost reports, including both narrative and statistical data, constitutes "cost or pricing data" pursuant to TINA. Specifically, *Texas Instruments* held that the data contained in similar job cost reports were "facts which could reasonably be expected to contribute to sound estimates of future costs and were, therefore, cost or pricing data." *Texas Instruments*, 87-3 BCA ¶ 20,195 at 102,277-78.

Alloy disputes this conclusion, contending that the data from DO 13 was "work in process" (WIP) data and the Army knew that it was Alloy's practice to not provide WIP data prior to completion of a job (app. br. at 66; findings 82, 88). Alloy did not

22

disclose its WIP data, because, prior to job completion and accounting reconciliation, the WIP reports included a significant amount of judgmental information relating to the accuracy of the data (findings 82-84; app. br. at 67). According to Alloy's CFO, Mr. D'Andrea, there previously have been substantial variations between the WIP reports and final reports. According to him, generating the WIP reports requires significant judgment, including the need to develop estimates for "equivalent units" prior to completing production and conducting the final inventory count (finding 84 ).

Mr. D'Andrea elaborated on this point during his hearing testimony, explaining that considerable judgment was involved in allocating both labor and material to particular jobs. For example, several different types of metal are combined into a slurry which is used to manufacture M211 flares for the Air Force, Navy, and Army. The raw metals used in the slurry must be allocated to each job consistently. In the same way, labor hours must be allocated to separate jobs, even though individual workers are not charging their time to each separate job. The allocation is done by someone in the production department. (Finding 84) Ultimately, as the Alloy official responsible for signing the Certificate of Current Cost or Pricing Data, Mr. D'Andrea did not believe the WIP sheets to be sufficiently accurate to certify until after the job had been completed and the accounting data had been reconciled (finding 86).

There is no dispute that the job cost reports from DO 13 contained factual data as well as estimated labor and material usage rates (finding 81). The government contends that the estimates of labor and material usage rates were accurate, based on a comparison of August and September 2006 job cost reports from DO 13 Lot 2 (gov't br. at 30-31). In August 2006, production was nearly complete on DO 13 Lot 2. By September, production was complete. The only difference between the reports was 4.5 hours of labor for packaging, a difference of only 0.0001 labor hours in the estimated labor usage rate, with no changes from the estimated to actual labor hours recorded for Alloy's manufacturing process steps. According to the government, this makes the job cost reports sufficiently accurate to constitute "cost or pricing data" pursuant to TINA. (Gov't br. at 31, 38)

Despite the relative accuracy of the estimates in the September and October 2006 job cost reports, we cannot conclude that the reports are "cost and pricing" data as that term is defined in TINA. While it may be true that the WIP data in the reports were substantially close to the actual data from the DO 13 Lot 2 production, the relative accuracy was due to the fact that the reports were generated near the end of the production run. It makes sense that the estimates of "equivalent units" in the reports would become more accurate toward the end of a production run, when actual production figures are close to being final. Although the estimates in the job cost reports may become more accurate as the end of a production run approaches, it is

23

impossible to point to a time along the continuum where the estimates become accurate enough to possess the requisite degree of certainty necessary for providing certified cost and data to the government.

Moreover, WIP data from other jobs that were in production at the time of negotiations demonstrate the unreliability of the WIP data (finding 85). Alloy's estimates of "equivalent units" – from which labor and material usage factors are derived – are based on subjective judgments about how many actual units will be produced at the end of the production run. These judgments cannot be verified until the end of the production run. (Finding 82) That the WIP data from DO 13 turned out to be reasonably close to the actual data from the completed job does not change the fact that the job cost reports were based on estimates of "equivalent units," and not on the actual number of complete units produced.

The estimated "equivalent units" found in the job cost reports are a fundamental part of the reports. Specifically, they are the denominator of the fraction used to calculate both labor and material usage factors. (Findings 83-84) Unlike the reports in *Texas Instruments*, which included verifiable factual data alongside estimates, Alloy's job cost reports set forth usage factors that are *calculated* using estimates. Thus, Alloy's job cost reports are fundamentally different from the reports in *Texas Instruments*.

We find this case to be more similar to *Aerojet Ordnance Tennessee*, ASBCA No. 36089, 95-2 BCA ¶ 27,922 at 139,444-45 (no reliance on internal operating controls certifying proposals to the government). WIP sheets, like the Internal Operating Controls (IOC) reports in *Aerojet*, are management tools based on an individual manager's judgment, not a cost accounting process relying on precision. In *Aerojet*, we concluded that, although the data in IOC reports may be accurate for management purposes and may even be close to accounting reports, the IOC reports do not possess the requisite degree of certainty necessary for providing certified cost and data to the government. *Id.** By the same token, Alloy's WIP sheets are management tools and do not possess the requisite degree of certainty necessary for providing certified cost and data to the government.

---

* We acknowledge that the Board's discussion of IOC in *Aerojet* is *dicta*, because the Board ultimately based its holding on the conclusion that the government did not demonstrate that the parties would have relied on the IOC reports in negotiating the price. However, we agree with the analysis in *Aerojet*.

24

III. The WIP Sheets for DO 13 Were Not Finalized Until After the Parties
Agreed to the Price for DO 14

We next analyze whether there was effective disclosure of the 2006 job cost
reports to the government during the price negotiations. We conclude that the raw
data from DO 13 were available by the end of price negotiations for DO 14, but that
the data were not in a form that Alloy reasonably could certify as "cost and pricing
data" pursuant to TINA.

The disclosure obligation is satisfied if the contractor clearly advised the
government personnel who participated in the contract negotiations of the relevant cost
or pricing data. *Texas Instruments.*, 87-3 BCA ¶ 20,195 at 102,266 (citing *Sylvania
Elec. Prods., Inc.*, ASBCA No. 13622, 70-2 BCA ¶ 8387, *aff'd*, 479 F.2d 1342 (Ct. Cl.
1973)). Alternatively, the disclosure obligation can be satisfied if the government
personnel possessed actual knowledge of the relevant cost or pricing data. *Texas
Instruments,* 87-3 BCA ¶ 20,195 at 102,266 (citing *Muncie Gear Works, Inc.*, ASBCA
No. 18184, 75-1 BCA ¶ 11,380 and *Norris Industries, Inc*., ASBCA No. 15442, 74-1
BCA ¶ 10,482).

Here, the government contends that appellant had access to the data contained
in the September 2006 report prior to the price agreement, but did not finalize the
report until afterwards (gov't br. at 49-50). Citing *Aerojet Solid Propulsion Co.*,
ASBCA Nos. 44568, 46057, 00-1 BCA ¶ 30,855 at 152,326, the government asks us
to infer that Mr. D'Andrea, as the person who was responsible both for finalizing the
September WIP report and for negotiating the price for DO 14, possessed knowledge
of relevant cost and pricing data and withheld that data from the government during
price negotiations. *See also Arral Indus., Inc.*, ASBCA Nos. 41493, 41494, 96-1
BCA ¶ 28,030 at 139,945 (data is reasonably available, and subject to disclosure, if
contractor's personnel at a management level are aware of its existence) (citing
*Aerojet-General Corp.*, ASBCA No. 12264, 69-1 BCA ¶ 7,664 at 35,583, *modified on
recon.*, 70-1 BCA ¶ 8,140)).

In response, Alloy acknowledges that it made a business decision not to
produce its WIP reports from DO 13 (finding 82). It further contends – and the Army
admits – that the Army was aware of Alloy's policy of not furnishing WIP sheets
(finding 88). Nonetheless, Alloy contends that it was not obligated to disclose the
September 2006 job cost report, because that report was not finalized until after the
parties reached agreement on the price of DO 14 (app. br. at 79-80).

Alloy's normal practice is to establish a "cutoff date" for assembling data for
each WIP sheet. After this date, Alloy takes a final physical inventory, reviews labor

timesheets, and reconciles the work-in-process data with the actual number of units produced and labor hours logged.  Alloy then finalizes the job cost report for the delivery order.  In this situation, the cutoff date was Sunday, September 24, 2006, and Alloy's management completed its reconciliation and finalized the report on Friday, September 29, 2006 (finding 116).  The Army does not contest this timeline, and there is nothing in the documentary evidence or hearing testimony suggesting that the job cost report could have been finalized more quickly, or that Alloy's management delayed reconciling the report while DO 14 price negotiations were ongoing.

We agree that Alloy possessed *some* of the relevant data from DO 13 in sufficient time to disclose it to the government's negotiators.  However, as we discussed in connection with the WIP reports from DO 13, at the time of price agreement on September 25, 2006, the information in the WIP reports did not possess the necessary degree of certainty to certify the reports as "cost and pricing data" pursuant to TINA.

IV.  Reliance

We turn next to the question of the government's reliance.  To prove that it relied on inaccurate or noncurrent cost or pricing data, the government is aided in meeting its burden by a rebuttable presumption that a "natural and probable consequence" of the nondisclosure was an increase in the contract price.  *Sylvania*, 479 F.2d at 1349.  The appellant must then show that the defective data was not relied upon or that the undisclosed data would not have been relied upon even if there had been a complete disclosure.  *Id.*; *see Aerojet Ordnance Tennessee*, 95-2 BCA ¶ 27,922 at 139,436.  The government, nevertheless, retains the ultimate burden of showing a causal connection between the undisclosed or defective data and an overstated contract price.  *Universal Restoration, Inc. v. United States*, 798 F.2d 1400, 1403-04 (Fed. Cir. 1986); *Grumman Aerospace Corp.*, ASBCA No. 27476, 86-3 BCA ¶ 19,091 at 96,494.

In this appeal, the government is entitled to a presumption that Alloy's failure to disclose the DO 13 data resulted in an overstatement of the price of DO 14.  Alloy, in turn, must overcome the presumption of reliance by demonstrating that the government did not rely on the DO 13 data, or that having the data from DO 13 would not have changed the price.

As we set forth in more detail below, we conclude that the Army has not met its burden of demonstrating that having the final job cost report from DO 13 would have changed its decision to rely on the weighted average of the data from Jobs 1516 and 1528. The Army used the data from Jobs 1516 and 1528 in setting the price for DO 14 with full knowledge of other data showing greater efficiency, because the Army

believed that the weighted average of the data from Jobs 1516 and 1528 best represented the likely performance of Plants 2 and 3 as they ramped up to meet the production rate necessary for DO 14. Moreover, the Army's rejection of Alloy's proposed 10 percent inefficiency adjustment reflected the Army's conclusion that some degree of ramp-up inefficiency already was captured in Alloy's price proposal. (Findings 68, 104).

DO 14, when awarded, would use the same type of automated equipment used on DO 13 (finding 24). Prudent buyers and sellers would reasonably expect the labor usage efficiency realized from DO 13 to significantly affect price negotiations in future orders. However, DO 14 would require Alloy to bring online two new manufacturing plants, including hiring and training new employees to operate the newly automated equipment (findings 22, 24). It is reasonable to conclude that starting up manufacturing at two new plants would create inefficiencies. It also is reasonable to conclude that the Army was aware of both the efficiencies of automation, and the inefficiencies of ramping-up production. Given these competing factors, the Army chose to rely on actual data from the previous delivery order.

A. The Parties' Contentions

Alloy contends that the Army had knowledge of at least three sets of labor usage factors lower than the weighted average usage hours it agreed to in its price negotiation (app. br. at 109). Alloy further contends that the Army knew that the negotiated usage factors were higher than most recent usage factors from Plant 1 (app. br. at 110).

In addition, the Army prepared its own independent government cost estimate and relied, in part, on it to establish Alloy's proposed prices as being fair and reasonable (app. br. at 97). Reliance on an independent government cost estimate rebuts reliance on allegedly defective price data. *Luzon Stevedoring Corp.*, ASBCA No. 14851, 71-1 BCA ¶ 8745 at 40,607.

According to Alloy, these facts undercut the Army's argument that it relied on the data from Jobs 1516 and 1528 to its detriment. Alloy contends that the Army accepted the Jobs 1516 and 1528 data, even though it was aware of other data showing greater efficiency, because the Army believed that the weighted average of the data from Jobs 1516 and 1528 best represented the likely performance of Plants 2 and 3 as they ramped up to meet the production rate necessary for DO 14. In support, Alloy points to multiple identical statements in the Final Technical Evaluation (and incorporated into the PNM) stating that the Army "acknowledged some inefficiency

could occur due to additional production rate ramp-up." (App. br. at 119-125; findings 72-74, 102, 104)

There are two ways to understand the sentences in the PNM. The first interpretation, as Alloy suggests, is to conclude that the Army was aware that the actual data was not representative, but accepted it as the best available indication of how the production rate ramp-up would affect prices going forward. Alternatively, the Army responds that it included the statement in the PNM in order to capture *Alloy's* stated concerns about ramp-up, not the Army's own judgment about ramp-up inefficiency. (Finding 103)

We believe Alloy's understanding of the statement is correct. The statement in the PNM means exactly what it says: that the Army agreed to the price in part because of the inefficiency that could occur due to additional production rate ramp-up. Indeed, the notion that ramp-up inefficiency was a factor in the Army's pricing deliberations is consistent with the documentary evidence and hearing testimony.

B. The Army Has Not Demonstrated That Having the DO 13 Data Would Have Changed the Negotiated Price

In order to prove reliance, the Army must provide specific information about *how* it would have used the DO 13 data in negotiations. The Army cannot rely on speculation about how it would have used the data or how having the data would have affected negotiations. *McDonnell Douglas Helicopter Sys.*, ASBCA No. 50447 *et al*., 00-2 BCA ¶ 31,082 at 153,465 (rejecting testimony of government witnesses that disclosure would have reduced price as conclusory and nonspecific); *Rosemount, Inc.*, ASBCA No. 37520, 95-2 BCA ¶ 27,770 at 138,456 (government offered no evidence or testimony as to how disclosure of data would have affected negotiations).

Here, the Army has not demonstrated that having the DO 13 data would have changed the negotiated price. The Army was aware of the effect of automation on labor and material usage factors, based on its oversight of the production prove-out of the automation machinery at Plant 1. (Findings 31, 67, 101) Indeed, this knowledge was the basis of the technical team's questioning of the Job 1516 and 1528 prices (findings 68, 98). Having the DO 13 data, therefore, merely would have reinforced the technical team's conclusions about the effect of automation. The Army's knowledge of the effect of automation undermines the causal connection between the allegedly undisclosed data and an overstated contract price. *See McDonnell Douglas Helicopter Sys.,* 00-2 BCA ¶ 31,082 at 153,469 (holding that government possessed knowledge of a lower price sufficiently close in time to facilitate negotiation of a lower price than that agreed to by the Army).

28

Moreover, because the DO 13 data was from Plant 1, the data would not have shed any light on the inefficiencies associated with starting and ramping-up production at the two new manufacturing plants. Although the Army could quantify the projected efficiency resulting from the increased use of automation, it was forced to speculate about the effect of ramping-up production at two new plants. Indeed, the fundamental problem with the government's position is that the DO 13 data sheds no light on the actual effect of ramp-up inefficiency on manufacturing in Plants 2 and 3.

The government does not dispute that it was aware of lower usage data from prior orders, but contended it did not rely on this data in its negotiations. Ultimately, the government was aware that the data from Jobs 1516 and 1528 was not the best – both because it did not reflect the latest automation and because it did not reflect the effects of rapidly ramping-up production – but it decided that the weighted average of the Jobs 1516 and 1528 data was the best it could do under the circumstances. Thus, the Army concluded that the weighted average of the Jobs 1516 and 1528 data represented the best compromise between automation efficiency and ramp-up inefficiency. (Findings 99, 102, 111)

An additional factor undercutting the Army's reliance was its awareness during negotiations that Alloy had failed first article testing (FAT) during the production prove-out of Plant 2. Because the Army knew that Alloy was having difficulty demonstrating that Plant 2 was ready for full-scale production, it was reasonable for the Army to believe that there would be some inefficiency associated with the assumption of full-scale manufacturing at the new plants. This knowledge was consistent with the Army's decision to adopt pricing that attempted to balance automation efficiency with the inefficiency of increased production.

Additionally, the evidence does not conclusively demonstrate that the government specifically asked Alloy to produce the data from DO 13 during price negotiations. We cannot conclude that the government was harmed by not having the DO 13 data, when it cannot demonstrate that it asked for the DO 13 data during negotiations. Although CO LaBell testified on direct examination that the Army had requested WIP sheets for DO 13 during the negotiations, on cross examination, CO LaBell acknowledged that she never told Alloy that she needed the DO 13 WIP sheets to award DO 14, nor is there any written record of an Army request for the DO 13 WIP sheets. (Finding 89)

Although CO LaBell said that the DO 13 data would have resulted in a lower price, her testimony during the hearing was non-specific (findings 93-97). According to the Army, having the DO 13 data "would have impacted the [CO's] willingness to agree to higher usage rates based on ramp-up inefficiencies[.]" (Reply br. at 4) This

argument is based on speculation. During the hearing testimony, none of the Army's witnesses provided any specific examples of how it would have used the DO 13 data, or specifically how the information would have changed the prices it agreed to during negotiations (findings 93-97, 111-113). The government fails adequately to answer the question of whether negotiators would have acted differently if they had been in possession of the undisclosed DO 13 job reports. Accordingly, we conclude that the Army has not proven that the price would have changed if it had DO 13 data in its possession during price negotiations.

C. Defective Pricing Clause is Not a Vehicle for Repricing a Contract Deemed to be Unreasonably Priced

As we have held in *Luzon Stevedoring Corp.*, 71-1 BCA ¶ 8745 at 40,604, the defective pricing clause is not a vehicle for repricing a contract which is deemed unreasonably high-priced. The clause does not provide a procedure for re-pricing a contract after award. *Id.*

That is precisely what the CO did here, as she admitted, stating that she agreed to a price in the absence of the DO 13 data, believing she could recoup any difference with a defective pricing claim after the fact:

> Q: You signed the Modification PO 25 relying on upon the certificate current costs and pricing data, on the assumption that you would be able to recover any defective pricing cost later, correct?
>
> A: Correct.

(Finding 96)

We conclude that the government has failed to meet its burden of proving that having the data from DO 13 during negotiations would have changed the pricing for DO 14.

V. Damages

Because we have concluded that the government is not entitled to a contract price adjustment, we need not reach the issue of quantum.

30

## CONCLUSION

For these reasons, the appeal is sustained.

Dated: April 9, 2020

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59625, Appeal of Alloy Surfaces Company, Inc., rendered in conformance with the Board's Charter.

Dated: April 9, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

31